# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **CHARLES T. STEWART,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 09 C 2062** |
| ) | **Judge Joan H. Lefkow** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Charles T. Stewart seeks judicial review of a final decision of the Commissioner of

Social Security denying his applications for disability insurance benefits under Title II of the

Social Security Act of 1935, as amended ("the Act"), 42 U.S.C. §§ 401 *et seq.* and supplemental

security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* Stewart, a

resident of the Northern District of Illinois, filed applications for disability insurance benefits

and SSI on January 19, 1993, and was found disabled on April 13, 1992, which is his alleged

onset date. Stewart's case was reviewed in 1996 and his eligibility was continued. Upon review

on May 26, 2000, however, the Social Security Administration ("the Commissioner") notified

Stewart that, as of July 2000, his medical condition had improved and he was no longer disabled.

Due to an "administrative error," R. 17, Stewart continued to receive benefits through August,

2004. Asserting that he had not received notice of the termination in 2000, after his benefits

ceased, Stewart sought reconsideration and a hearing. On March 20, 2008, Stewart's claim was

heard on the merits at a hearing before Administrative Law Judge Helen Cropper ("the ALJ").

The ALJ determined that Stewart was not disabled as of the cessation date of May 1, 2000 and

had not been disabled from that period forward to the present. The ALJ's decision was adopted

by the Appeals Council. Its final decision is dated February 6, 2009. This complaint was timely

filed on April 3, 2009. This court has jurisdiction over this case under 42 U.S.C. §§ 405(g) and

1383(c).

Stewart asks the court to reverse the final decision under the relevant provisions of the

Act, including 42 U.S.C. §§ 416(i), 423(d), and 1382, or to remand this case for further

consideration of his claims. The parties have filed cross-motions for summary judgment. For

the following reasons, the court will remand the case to the Commissioner.

## STANDARD OF REVIEW

The administrative law judge's opinion on a claimant's disability must be upheld if it is

supported by substantial evidence on the record as a whole. *Walker* v. *Bowen*, 834 F.2d 635,

639-40 (7th Cir. 1987) (quoting *Smith* v. *Schweiker,* 735 F.2d 267, 270 (7th Cir. 1984)).[1]

"Substantial evidence has been defined as such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Aidinovski* v. *Apfel*, 27 F. Supp. 2d 1097, 1101

(N.D. Ill. 1998) (quoting *Estok* v. *Apfel*, 152 f.3d 636, 638 (7th Cir. 1995). The court may not

reweigh the evidence. *Walker*, 834 F.2d at 640. "Where conflicting evidence allows reasonable

minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on

the Secretary (or the Secretary's designee, the ALJ)." *Id.* (citing *Delgado* v. *Bowen*, 782 F.2d

79, 82-83 (7th Cir. 1986)). "Therefore, the question presented for review is not whether [the

claimant] is disabled, but only whether the ALJ's finding of non-disability is supported by

---

[1] The Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

substantial evidence in the record." *Id.* Finally, the ALJ must articulate her assessment of the evidence and the basis for her conclusion in order to "build an accurate and logical bridge from the evidence to the conclusion." *Giles ex rel. Giles* v. *Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott* v. *Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). Without such an explanation, the courts cannot undertake any meaningful review and should remand the case. *See id.* at 488; *Steele* v. *Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## STANDARDS GOVERNING DISABILITY DETERMINATIONS

Under governing regulations, continued entitlement to disability insurance benefits or SSI (the disability determination standards are the same so the term disability insurance benefits will be used for the sake of convenience) must be reviewed periodically to determine whether an individual's disability continues. If one's medical condition has improved to the point that he is able to engage in substantial gainful activity, the Commissioner will determine that disability has ended and terminate benefits. 20 C.F.R. § 404.1594(a). Although there is no presumption that disability continues, *see Soper* v. *Heckler*, 754 F.2d 222, 224 n.1 (7th Cir. 1985), the Commissioner bears the evidentiary burden to demonstrate that a disability has ceased. *See* 20 C.F.R. § 404.1594(b)(5) ("In most instances, we must show that you are able to engage in substantial gainful activity before your benefits are stopped."); 20 C.F.R. § 404.1594(c)(3)(i) (1988) ("If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work. We must, of course, also establish that you can currently engage in gainful activity before finding that your disability has ended.").

Regulations prescribe a sequential eight-part test for determining whether a claimant remains disabled. 20 C.F.R. § 404.1594(f). Under this test the Commissioner must consider the following: (1) whether the claimant is engaging in substantial gainful activity during the period for which he claims disability; if not, (2) whether the claimant has a severe impairment or combination of impairments which meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; and, if not, (3) whether there has been medical improvement (as defined). If there has been medical improvement, the Commissioner decides (4) whether there has also been improvement in the claimant's residual functioning capacity ("RFC") as compared to the date of the most recent favorable decision finding him disabled ("comparison point decision" or "CPD"); and, if so, (5) whether certain exceptions (not relevant here) apply. If medical improvement has increased the claimant's ability to work, the Commissioner determines (6) whether all of the claimants's current impairments are severe; and (7) whether the claimant has the current ability to do substantial gainful activity. If the claimant is not able to do work he has done in the past, the Commissioner considers (8) whether, "[g]iven the residual functional capacity assessment and considering [the claimant's] age, education and past work experience, can [he or she] do other work?" If he can do other work, the disability has ended. If not, the disability determination continues. 20 C.F.R. § 404.1594(f)(8). This process is sequential, and if at any step the ALJ can make a conclusive finding that the claimant either is or is not disabled, the inquiry ends and the ALJ need not continue. 20 C.F.R. § 404.1594(f) ("Our review may cease and benefits may be continued at any point if we determine there is sufficient evidence to find that you are still unable to engage in substantial gainful activity.")

## I.    FACTS

The facts stated in a light favorable to Stewart are these:

Charles Stewart was born on April 3, 1960, was 32 at the onset of his disability, and 47 at the time of the hearing. R. 66. Stewart is 5'9" tall and weighs 146 pounds. He was educated through the twelfth grade plus approximately one-and-a-half years at Southeastern Illinois College. R. 210, 250-51, 374. He served in the military between 1984 and 1991, receiving an honorable discharge. R. 250-51. He attempted to reenlist but was found unfit for duty as a result of a back problem. R. 250. He was previously employed as a postal worker. R. 251. Stewart last worked at Helene Curtis, for about four years ending in 1991, and has not since performed substantial gainful activity. R. 156.

### A.    Medical Evidence

#### 1.    Physical Impairments

In December of 1992, Stewart reportedly underwent back surgery due to his work related injury. R. 46; *but see* R. 218.[2] In April of 1996, he fractured his right ulna. R. 22. On December 6, 1991, during his employment at Helene Curtis, Stewart was severely injured when he was struck in the back by a forklift and thrown six to eight feet. R.124, 167, 338. He was hospitalized for approximately 18 months and treated with rehabilitation and psychiatric services. R. 209, 338. On March 31, 2000, he underwent a consultative examination by a State agency-selected physician, Hilton Gordon, M.D., who diagnosed low back syndrome with limitations in lumbar range of motion, and status post fracture of the left fifth finger bone graft, finding finger tenderness and inability to completely flex or extend the finger. R. 213-15. A

---

[2] A 2004 medical history reflects that surgery was recommended but not done. R. 218.

non-examining State agency reviewer, E.C. Bone, completed a Physical RFC form finding Stewart, as of May 2001, capable of medium level work with occasional postural limitations in all areas and slight limitation in performing jobs requiring fine manipulation with his left hand. R. 241-48.

On July 7, 2003, Stewart sustained a closed fracture of the left distal radius and to the soft tissue along the ulnar border of the hand as well as blunt chest trauma after falling from a roof while positive for alcohol. R. 479, 494, 520-44. He underwent surgery of his left wrist performed by Terry R. Light, M.D., and required several months to recover. R. 481-517. A CT chest exam from July noted multiple bullae in the right lung apex and multiple small bilateral renal cysts. R. 539.

On July 26, 2004, Stewart underwent another internal medicine consultative examination by a State agency-selected doctor, Dominic Gaziano, M.D. This examination revealed a history of low back pain, hypertension, and enlarged heart, inability to walk 50 feet without assistance, inability to toe or heel walk, pain upon extension and flexion, walking with slow short steps, a limited range of motion of the lumbosacral spine, an inability to squat more than 1/5 of the way to the floor, and finger and right wrist fractures with decreased hand grip. R. 218-22.

On November 16, 2004, Stewart was seen at the Rehabilitation Institute of Chicago. R. 409. The examiner diagnosed chronic low back pain without neurologic deficit. R. 410. Stewart was admitted to Little Company of Mary Hospital in January of 2005 for four days, suffering from left-side weakness and a syncope episode with left hemiparesthesia and a positive alcohol level. R. 435-75. A CT scan of Stewart's brain showed no significant abnormality. R. 465.

A record of a cardiac examination prepared by Nalini Rajamannan, M.D., dated June 13, 2005, noted findings consistent with non-ischemic cardiomyopathy.  R. 381, 385.  Stewart was started on a beta blocker for high blood pressure.  R.381..

On March 17, 2007, Stewart fell injuring his back and suffering a rib fracture of the posterior left eleventh rib.  He sought treatment at the Little Company of Mary Hospital emergency room, there admitting that he had been drinking. R. 354-58, 423-34.  On April 11, 2007, Stewart was seen for follow-up from this fall.  Notations were made of numbness with pain, right lower leg pain, and right hand swelling and erythema.  R. 349.  He was given Vicodin for his fractured rib pain.  R. 351.

An ER record from Little Company of Mary, dated May 14, 2007, noted that Stewart presented and was treated for "unbearable" lower back pain radiating down his right leg. R. 292-93.  The impression was back pain, with a differential diagnosis including a herniated disk, vertebral collapse, muscular spasm, sciatica; infections of pyelonephritis, pancreatitis; abdominal aortic rupture, mesenteric ischemia and renal artery stenosis; medication withdrawal; and drug-seeking behavior.  R. 294-304.  A radiology report suggested loss of lordosis and dextroscoliosis with possible back muscle spasm.  R. 305.  He was given Motrin, Vicodin and Flexeril upon release.  R. 346.

On November 19, 2007, Stewart was seen at the Rehabilitation Institute of Chicago for chronic lower back pain and weakness of the L5 muscle on the right side.  R. 404-08.
On December 10, 2007, an MRI of Stewart's lumbosacral spine showed straightening of the normal lumbar lordosis, a diffuse bulge at the L4-5 level with superimposed right foraminal to right far lateral disc extrusion with superior migration resulting in severe right forminal stenosis,

directly compressing the undersurface of the right L4 nerve root, mild spinal canal and mild left neural forminal stenosis, and a cystic lesion within the right kidney. R. 411-12.

## 2. Mental Impairments

### a. *From 1996 to May 1, 2000*

The fork lift injury took a toll on Stewart's mental health. In April, 1992, he began treatment in an intensive outpatient program at Northwestern Memorial Hospital, where he was diagnosed with an adjustment disorder with a provisional diagnosis of an unspecified psychotic disorder. R. 22. The doctor noted depression, anxiety, and persecutory feelings subsequent to a back injury, with an inability to tolerate stress and difficulty following instructions. R. 545-46.

As reported by Disability Hearing Officer Mike Finley on October 11, 2005, a March 1992 psychological evaluation by Mark Moultrop, Ph.D., characterized Stewart's behavior as highly dramatic with exaggerated presentation of complaints and a sense of self importance, entitlement, self aggrandizement and self-righteousness. R. 99. Stewart was diagnosed with a personality disorder. *Id.*

On June 3, 1994, Stewart was arrested for a DUI and driving on a suspended license and was subsequently treated in an inpatient alcohol rehabilitation program from May 4, 1995 through May 12, 1995. R. 22, 375-80, 547-52. He was identified as a "problem drinker." R. 378, 550. A record from Stewarts's substance abuse counselor dated April 27, 1998, noted that Stewart had regularly been receiving substance abuse counseling and appeared committed to sobriety. R. 558.

Dr. Embar examined Stewart for the State agency on March 31, 2000. Her examination consisted of interviewing the patient and reviewing three mental health examination reports

from1992.  R. 209.  She found his mental status as "angry and hostile regarding his accident and situation.  Behavior was appropriate, [p]sychomotor activity was somewhat anxious."  R. 210.  His speech was loud but normal, mood depressed, affect "angry, anxious, appropriate."  He denied perceptual disturbances.  "There was no paucity, loose associations or flight of ideas, no circumstantiality, tangentiality or distractibility.  No evidence of thought disorder, but he admits to worries."  *Id.*  His intellectual skills were satisfactory.  In summary, "Claimant is a 39 year-old male with history of depression as well as [PTSD] secondary to injury at his job."  Her diagnosis was PTSD and, provisionally, chronic depressive disorder.  R. 211.

A review was performed by Dr. Linda M. Hudspeth, D.Psy., who prepared a Psychiatric Review Technique Form ("PRTF") designed to comply with the "special technique" required for assessment of mental impairment.  20 C.F.R. § 404.1520a(a).  R. 230-40.  Although dated January 28, 2005, the report summarized earlier findings based on records compiled in 1992 and 2000, apparently obtained for the determination that led to termination of benefits in 2000.  Dr. Hudspeth found a history of anxiety-related disorders and personality disorders.  R. 232, 234-35.  She concluded that Stewart was "not significantly limited" in activities of daily living, moderately limited in social functioning (ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors), as well as moderately limited in concentration, persistence, or pace  R. 230-32.   She found no episodes of decompensation.  Dr. Hudspeth concluded that Stewart could perform unskilled work in a "simple job situation."  R. 232.[3]

---

[3] 20 C.F.R. § 404.1520a(d)(1) implies that moderate impairment may qualify as a severe impairment where the evidence shows that it is "more than minimal":

(continued...)

b.      *From May, 2000 to October, 2005*

On July 26, 2004, Stewart underwent a consultative examination by a State agency physician, Helena M. Radomska, M.D., who noted Stewart's history of "flashbacks" to the factory forklift injury, drinking heavily for six months after the incident, difficulty sleeping, and previous group therapy for emotional problems.  R. 225-29.  Dr. Radomska diagnosed a history of PTSD, currently stable; alcohol abuse; mild but stable social stressors; and a functioning GAF level of 60.  R. 229.[4]

Dr. Radomska prepared a mental RFC assessment, which reported Stewart as not significantly limited in 2 of 3 criteria of understanding and memory; not significantly limited in 6 of 7 criteria of sustained concentration and performance; not significantly limited in 3 of 5 criteria of social interaction, and not significantly limited in all four criteria of adaptation.  Dr. Radomska found moderate limitation of ability to understand, remember, and carry out detailed instructions, ability to interact appropriately with the general public, and ability to accept instructions and respond appropriately to criticism from supervisors.  R. 230-31.  Dr. Radomska wrote, "He has moderate social/interpersonal difficulties but is capable of cooperating and

---

[3](...continued)
      If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

[4]A GAF of 51-60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (rev. 4th ed. 2000) (DSM-IV TR).

relating in a simple job situation.  He could adapt in such a job.  He could perform unskilled work."  R. 232.

Stewart's attorney arranged for an independent medical examination by Louis E. Hemmerich, Ph.D., during August-September, 2005.  Dr. Hemmerich, in addition to taking Stewart's personal history,  performed nine psychological tests during two sessions.  During the evaluation, Dr. Hemmerich found Stewart to have slightly pressured speech at times, depressed affect, agitated and volatile mood and considerable anxiety.  R. 252-53.  A Minnesota Multiphasic Personality Inventory II ("MMPI-2") test revealed considerable emotional turmoil indicative of an individual who lacks emotional control and, when under stress, is likely to decompensate.  R. 253.  The Beck's Depression Inventory ("BDI"), measuring Stewart's own perception of his level of depression, revealed a "serious" degree of depression.  R. 254.  Dr. Hemmerich diagnosed major depression and generalized anxiety disorder and personality disorder with narcissistic, paranoid, and histrionic trends.  R. 255.

Dr. Hemmerich also completed a PRTF finding that Stewart meets Listings 12.04, 12.06 and 12.08 for affective, anxiety and personality disorders.  R. 260-65.  Dr. Hemmerich's mental RFC assessment reflects marked limitation of ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; and ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. 257-58.  He found moderate limitations of several other functional criteria.  Dr. Hemmerich concluded, "It is my current clinical opinion that this individual would be unable to function in a normal work[-]

11

like setting without undue interruptions and an excessive amount of supervision at this time."  R.

255.

Dianne Stevenson, Psy.D, examined Stewart at his counsel's request on December 13,

2007.  She also performed a battery of tests and a mental RFC assessment.  R. 312-332.  She

found a full scale IQ of 87 (19th percentile).  R. 314.  Bender Gestalt testing indicated an organic

impairment and problems with overlap error, simplification, fragmentation, preservation and

angulation.  *Id.*  The Wide Range Achievement Test ("WRAT-3") showed that he has only sixth

grade arithmetic abilities.  *Id.*  A BDI revealed severe clinical depression, and an MMPI-2

showed poor coping and memory, attention and concentration interrupted by tangential thinking,

an ineffectiveness in interpersonal relationships and serious deficits in social skills as well as

difficulty with stress.  R. 315-16.

Dr. Stevenson diagnosed schizoaffective disorder, depressive type, schizoid personality

disorder with paranoid features, and a current GAF of 55.  R. 316.  She found moderate

restriction of activities of daily living, moderate difficulties in maintaining social functioning,

and marked difficulties in maintaining concentration, persistence, or pace.  She also noted three

repeated episodes of decompensation, each of extended duration (although the basis of this

conclusion is not apparent from her written assessment[5]).  R. 326.  Her Mental RFC assessment

---

[5] Episodes of decompensation are exacerbations or temporary increases in symptoms or
signs accompanied by a loss of adaptive functioning, as manifested by difficulties in
performing activities of daily living, maintaining social relationships, or maintaining
concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

found Stewart markedly limited in his ability to maintain attention and concentration for extended periods of time, work in coordination with others, interact with the public, get along with co-workers, accept instructions and criticism from supervisors and set plans and realistic goals independent of others. R. 330-31. She also found Stewart to be moderately limited in the ability to perform almost every other mental activity. *Id.*

She concluded,

> The results of the clinical interview, testing, and past documentation indicate a marked disturbance in intellectual, emotional, and psychological functioning. Charles's intellectual limitations and social ineptitude have impacted on his interpersonal functioning and his ability to obtain competitive employment. As a result of these issues, he would be unable to perform work related to tasks that require concentration and attention to details, sustained efforts, operating machinery, or physical labor.
>
> He would have difficulty maintaining a workplace daily routine. His prognosis is felt to be poor for any substantial improvement. He is able to manage his own affairs without assistance, but may engage in inappropriate financial activities.
>
> He is at significant risk for suicidal ideation and gesture. It is recommended that he be evaluated for antipsychotic medication. Individual counseling is strongly recommended.

R. 316. Dr. Stevenson then completed a PRTF finding Stewart to meet Listing 12.03 [Schizophrenic, Paranoid and Other Psychotic Disorder], and 12.08 [Personality Disorder] R. 317-29.

## B. Stewart's Testimony

Stewart tried to work after his injury, but his past employer had closed and he was unable to sustain even part-time work. R. 647-48, 664-68. He no longer has a driver's license due to DUI issues. He was arrested 20 years prior for possession of a firearm. R. 670-74, 710-11. His mother owns some buildings at which he tries to help out by paying and mailing bills, as well as taking out the garbage and cutting the grass, as she has a riding lawn mower. R. 675. He cannot climb a ladder to change light bulbs but washes dishes, cleans, makes coffee, feeds the dog and does laundry. R. 676, 712. He helped another woman at his church learn to read as a volunteer. R. 677. He watches his grandchildren with his mother sometimes, loves to read, watches TV, and goes to church about once a month. R. 713-14.

Stewart suffers from constant and chronic lower back pain since being struck by the forklift. R. 679. Stewart's back pain has gradually progressed, aggravated by weather changes and swelling. *Id.* He tries to walk to exercise, but it depends on the day; sometimes he can walk a block, some days 10 blocks. R. 681. He walks to the park and listens to 60-minute biofeedback tapes. R. 682. He fell off a roof when he tried to move a tree that fell on his mother's house. R. 683. He injured his left wrist, which is still stiff and swollen; he is right-handed. R. 686. He was born with a weak left arterial muscle. In June 2005, he tripped and fell over his dog and fractured his ribs. R. 692-93. He sought anger management treatment in 2002 and previously obtained treatment for his drinking, although there are still times when something bad happens where he will drink. R. 697-708. He indicated he did not qualify for Veterans Administration treatment and did not know mental health treatment was free at Cook County Hospital. R. 612-16, 636-39. Using both hands, Stewart can lift 7 to 10 pounds. R. 714. If he

stands for 10 minutes or more, he often suffers from back spasms. R. 715. He must constantly

change positions every five to ten minutes and often needs to sit and stand to accommodate the

back pain. R. 716. On the days his back is swollen, he often vomits after eating from the spasms

and pain. R. 718.

## THE ALJ'S DECISION

The ALJ measured whether Stewart's medical condition had improved from his

Comparison Point Decision ("CPD"), *i.e.*, June 20, 1996, based on a then-recent fracture of his

upper right arm to the date of termination of benefits, May 1, 2000. She first reviewed the

medical evidence for the period prior to the CPD, which was the basis for the 1992 and 1996

disability determinations. She found that the 1996 determination had been based on "the

medically determinable impairment of a recent fracture of his right upper extremity." She also

noted the absence of any mental health evidence or mental RFC opinion having been submitted

for that determination (other than possible alcohol abuse treatment). R. 21, 23.[6]

The ALJ found that between the CPD and May 1, 2000, Stewart had not engaged in

disqualifying Substantial Gainful Activities ("SGA") (step 1); that he had been treated for

additional impairments after the CPD, including two broken bones, a heart condition, and back

pain, and that he had received consultative psychological and/or psychiatric examinations, with

various diagnoses of mental impairments. The ALJ further found that Stewart's condition had

improved as of May 1, 2000 compared to the CPD (step 3).

---

[6] A consulting psychiatrist's notes indicate that Stewart was initially allowed benefits (in 1992) "on the basis on [*sic*] a Personality Disorder with Narcisstic [*sic*]/Paranoid and Histrionic Features." A review in 1996 resulted in continuation of benefits "but with a basis of Fracture of the Right Ulna Shaft and a secondary diagnosis of History of Personality Disorder. The psychiatric issue did not appear to be considered disabling." R. 239.

For the period after May 1, 2000 to the date of the hearing, the ALJ found that Stewart did not have a physical or mental impairment or combination of impairments that met or equaled the severity of a listed impairment.  R. 24.  She found the claimant's medically determinable impairments could have reasonably been expected to produce the alleged symptoms but that his statements concerning the severity of the symptoms were not credible to the extent they were inconsistent with the RFC assessments.  R. 39. The ALJ wrote,

> [T]he record does not establish that claimant has had marked limitations in daily or social activities for any consecutive 12-month period or longer, or that he has marked limitation in the ability to sustain concentration, persistence or pace caused by mental impairments.  Claimant has no documented episodes of decompensation after 1996, and he has not been in or needed a highly structured environment during the relevant time.

R. 29.

The ALJ determined that as of May 1, 2000 and continuing to the present, Stewart had the physical RFC to perform a wide range of unskilled light work,[7] with reservations as follow as defined at 20 C.F.R. 404.1567(b) (steps 4, 6):

> He can lift, carry, push and/or pull up to 20 pounds occasionally and up to 10 pounds frequently, and he can sit, stand and/or walk throughout a normal workday, with typical breaks.  He should never climb ladders, ropes or scaffolds or work on moving or unstable surfaces, and should not be exposed to

---

[7] 20 C.F.R. § 220.132(b) defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If [the claimant] can do light work, [the Board] determines that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

unprotected heights or unguarded hazardous equipment. He can occasionally climb ramps or stairs, stoop, kneel, crouch or crawl.

R. 29. She further found that Stewart had the mental RFC throughout the period after May 1, 2000 to perform and sustain unskilled work (steps 4, 6):

He can understand, remember and carry out simple, routine instructions, can respond appropriately to supervisors, coworkers, and usual work situations, and can deal with the kind of changes that would be expected in a routine work setting. He would be distracted only rarely by pain, fatigue or other symptoms, to the extent that he was off task and not productive, outside break time.

R. 29. The ALJ rejected the findings of Stewart's retained consultants in favor of the State agency examiners, Dr. Singh and Dr. Hudspeth. R. 29. She found that his medical improvement increased his ability to work, that his back pain currently is severe and would impose at least minimal limitation on that ability, that he was unable to do his past work, but that as of May 1, 2000 he had the RFC to perform a significant number of jobs in the national economy, and that his disability ended as of May 1, 2000 (steps 7, 8). R. 41-42.

## II.   THE ISSUES

Stewart raises the following issues:

1. Whether the ALJ improperly applied the "medical improvement" standard to Stewart's medical condition before concluding that Stewart's condition had improved;

2. Whether the ALJ posed a proper hypothetical to the vocational expert where (a) her credibility findings were not made consistently with SSR 96-7p and (b) she failed to take into account Stewart's mental as well as his physical impairments; and

3. Whether the ALJ's step eight determination was erroneous in that it does not show that there is work in the national economy that Stewart can perform.

A. **Whether the ALJ improperly applied the "medical improvement" standard to Stewart's medical condition before concluding that Stewart's condition had improved**

Stewart contends that any improvement in his medical condition since the CPD has not increased his ability to engage in substantial gainful activity, a condition that must be met before his benefits may be terminated. 20 C.F.R. § 404.1594(b)(2).[8] He argues that the ALJ's decision was based on incomplete examination of all of the evidence and she improperly rejected evidence, particularly relating to mental impairments.[9] Stewart also contends that the ALJ failed to apply the "special technique" set out at 20 C.F.R. § 404.1520a(a) in assessing the severity of his mental impairments. He contends that she failed to address whether his failure to seek treatment was a result of his inability to acknowledge his illness rather than the absence of it.

Insofar as Stewart complains about the ALJ's failure to consider all of the evidence and to make appropriate findings of fact, the court is not persuaded. The ALJ painstakingly recited and evaluated the evidence. She set out specific reasons for rejecting Stewart's credibility as inconsistent with the medical records. She noted that Stewart had denied at the hearing any current or recent symptoms of mental impairment and testified that he had not sought treatment

---

[8] This section provides:

> Medical improvement not related to ability to do work. Medical improvement is not related to your ability to work if there has been a decrease in the severity of the impairment(s) as defined in paragraph (b)(1) of this section, present at the time of the most recent favorable medical decision, but no increase in your functional capacity to do basic work activities as defined in paragraph (b)(4) of this section. If there has been any medical improvement in your impairment(s), but it is not related to your ability to do work and none of the exceptions applies, your benefits will be continued.

[9] Stewart argues, "The ALJ incorrectly found that the Plaintiff had medically improved due to an increased functional capability . . . ." The court infers that this statement, taken literally, is not what Stewart means, *i.e.*, that the ALJ first found increased RFC and inferred medical improvement from that finding. The ALJ's decision does not indicate that this occurred.

during the relevant time period. She acknowledged that a claimant's denial of mental illness is not necessarily dispositive of the absence of it but inferred that "it seems very clear from the record as a whole that claimant here does not suffer from a listing-level mental impairment." R. 28. She noted that in the many contacts with medical providers not related to Stewart's claim for disability benefits, "his mental status has been described either as normal or has not been remarkable, suggesting that he has not displayed obvious or serious clinical signs of mental illness during those contacts," including to a Dr. Press, who had referred Stewart for emergency mental health treatment in 2002 but made no mention of mental impairment in 2004 and 2007 treatment notes. She noted inconsistencies in Stewart's reported denial of alcohol abuse to the consulting psychologists as being inconsistent with the medical records that indicated a much more significant issue. R. 28.[10] In short, the ALJ firmly rejected Stewart's credibility as to his condition: "It appears that claimant has sought treatment in the past primarily to bolster his disability claims, and not actually to seek treatment for significant physical problems or complaints." R. 41.

These findings and conclusions are supported by substantial evidence in the record. It is true that the reports of the consulting psychologists included standardized testing designed to account for bolstering by the patient, and could be accepted as more reliable than the competing evidence prepared by State agency consultants (even though the two consultants reach somewhat different conclusions), this court is not permitted to weigh the evidence. It may only consider

---

[10] "[I]f such abuse is the cause of her disability, [the claimant] is barred by statute from obtaining benefits." *Kangail* v. *Barnhart,* 454 F.3d 627, 628 (7th Cir. 2006) (citing 42 U.S.C. § 423(d)(2)(C): *Vester* v. *Barnhart,* 416 F.3d 886, 888 (8th Cir. 2005)).

whether the record as a whole contains substantial evidence supporting the ALJ's conclusion that Stewart's condition has improved such that he does not suffer a listed impairment or combination of impairments equal to a listed impairment. Plainly, it does.

The cases Stewart cites in support of his position that his own testimony denying mental illness should have been accepted as credible present quite different circumstances from those here. In *Blankenship* v. *Bowen*, the claimant had testified to panic and depression, allegations that were supported by medical evidence, but the ALJ rejected the testimony, in part, because the claimant had not sought treatment. 874 F.2d 116, 1129 (6th Cir. 1989). The court ruled that the ALJ did not have a substantial basis for rejecting the claimant's credibility where his testimony was consistent with the medical evidence, remarking, "Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Id.*. In *Kangail* v. *Barnhart*, the court remanded where the ALJ determined that the claimant could work if she stopped abusing alcohol and drugs and took medication prescribed for her bipolar disorder, suggesting that she could help herself if she wanted to. 454 F.3d 627, 631 (7th Cir. 2006). The court, citing medical literature concluding that bipolar disorder "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment," rejected this as unsupported by the medical evidence. *Id.* In *Regennitter* v. *Commissioner*, similarly, the ALJ treated two psychological reports as inconsistent and also faulted the claimant for not continuing treatment. 166 F.3d 1294, 1296 (9th Cir. 1999). The court rejected the finding that the two diagnoses of major depression and panic disorder were inconsistent and found no substantial evidence for rejecting the claimants "uncontested explanation" for not seeking more treatment,

that he could not afford it because his insurance had run out.  In *Wilder* v. *Chater*, the court remanded for further consideration and possibly the taking of more evidence where the only medical evidence of the claimant's mental condition was a diagnosis of major depression but where the ALJ's decision was based on a variety of assumptions and speculations.  64 F.3d 335, 337-38 (7th Cir. 1995).

In each of these instances, there was unequivocal evidence of a diagnosis that met a listed impairment, which the ALJ either implicitly or explicitly rejected for improper reasons.  In the case before this court, the ALJ weighed competing diagnoses and explained her reasons for rejecting the more severe ones.  The ALJ's written decision meticulously incorporated the pertinent findings and conclusions of the medical providers, including all significant examinations and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s) based on the mental RFC assessments.  This conclusion is adequately supported by the record and supported by Stewart's own testimony.  This is not a situation in which the ALJ based her decision on the absence of medical evidence but one in which much of the medical evidence belied Stewart's allegations.  The ALJ's conclusions are supported by substantial evidence.

This being said, there is a minor gap between the finding that Stewart's condition does not meet a listed impairment and medical evidence that he has moderate impairment of some of the functions necessary for performing substantial gainful activity.  To comply with the "special technique,"

> . . . the written decision [of the ALJ] must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the

21

mental impairment(s). The decision must include *a specific finding as to the degree of limitation in each of the functional areas* [activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.]

20 C.F.R. § 404.1520a(c)(4). (emphasis added).

The ALJ did not specifically find the degree of limitation in each of the functional areas but only that of social functioning ("moderate social/interpersonal difficulties.") R. 36. Nonetheless, she accepted the findings of the State agency physicians, Dr. Hudspeth, Dr. Embar, Dr. Singh, and Dr. Radomska. Dr. Hudspeth diagnosed anxiety-related disorders and personality disorders and found mild impairment of activities of daily living, moderate limitation of social functioning, as well as concentration, persistence, or pace (as of 2000). Dr. Embar did not complete a mental RFC assessment. Dr. Singh's examination is not in the administrative record.[11] The only actual examination that post-dated May 1, 2000, is that of Dr. Radomska, who found "moderate" social/interpersonal difficulties but apparently did not perform a mental RFC assessment that complies with the "special technique."

This means that the only substantial evidence in the record regarding the extent of mental impairment on Stewart's RFC is that of Dr. Hudspeth. Her findings of moderate impairment of two of the four functions, while not inconsistent with "not marked," are inconclusive as to whether Stewart's mental impairments would affect his RFC. Although not strictly compliant with the duty to make a specific finding as to the degree of limitation in each of the functional areas, that the ALJ's decision adopted Dr. Hudspeth's conclusions is a reasonable inference for

---

[11] The court cannot make a determination of substantial evidence without the evidence's presence in the record; thus, Dr. Singh's opinion is disregarded, as well as any RFC assessment Dr. Embar may have performed.

her conclusions for the period ending May 1, 2000 and Dr. Radomska's conclusions for the

period between May 1, 2000 and the date of the hearing.

> **2.** **Whether the ALJ posed a proper hypothetical to the vocational expert where (a) her credibility findings were not made consistently with SSR 96-7p and (b) she failed to take into account Stewart's mental as well as his physical impairments**

Stewart makes additional lengthy arguments attacking the ALJ's methodology in

reaching her conclusion, mostly repetitive of those addressed above. The entire record, however,

points to the conclusion that in posing the hypothetical to the vocational expert ("VE"), the ALJ

did not include a number of limitations that would likely bear on his ability to work. *See Craft* v.

*Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) ("If the mental impairment does not meet or is not

equivalent to any listing, then the ALJ will assess the claimant's RFC.", citing 20 C.F.R. §

404.1520a(d)(3)).

> The ALJ posed the following hypothetical:

> The claimant is at all relevant times less than 50 years old, completed high school, attended college for a total of maybe about three years, but did not earn a degree in any of those programs and has no work activity during the last 15 years. In addition, for the first hypothetical, if you would assume he has the residual functional capacity to perform the full range of work at the light exertional level with the following exceptions or limitations[:] He should never climb ladders, ropes or scaffolds or work on moving or unstable surfaces and should not perform work that would expose him to unprotected heights or unguarded hazardous equipment. Can you identify occupations that hypothetical person could perform?

R. 721. The VE responded that the hypothetical individual would be capable of performing the

work of an assembler, hand packer, or hand sorter. R. 722. In a second hypothetical she added

the limitations of ability to "only occasionally climb ramps or stairs and only occasionally stoop,

kneel, crouch or crawl. *Id.* The VE responded that these limitations did not change his opinion.

Even limited to sedentary work, the VE opined that an individual with all of these limitations

could perform work within the national economy. *Id.*. Finally, the ALJ inquired as to the effect if the individual were distracted frequently by pain, fatigue, or any other kind of distraction such that he was off task and not productive. R. 723. The VE responded that there would be no substantial gainful activity for that individual. *Id.*.

This recital demonstrates that the ALJ did not include any mental impairments in her hypotheticals. Neither does the decision acknowledge that a mental impairment need not be "marked" (as opposed to moderate or minimal) in order to qualify as severe. *See Craft*, 539 F.3d at 675, C.F.R. § 404.1520a(d)(1), and note 4, *supra*. . Thus, a proper hypothetical should have included the specific limitations cited by the psychologists on which she relied.

The same can be said for the ALJ's failure in her hypothetical to include the documented history of lower back pain (albeit at times exaggerated by him), arm and finger pain, limited lumbar flexibility and the disabled finger. Light work may involve sitting most of the time with some pushing and pulling of arm or leg controls. Such skills could be affected by these physical impairments. Thus, the court will remand this case for a fuller inquiry of the VE as to Stewart's combined physical and mental RFC. Once this is accomplished, Stewart's third argument that the step eight determination was erroneous will be resolved.

**ORDER**

The Commissioner's motion for summary judgment is denied.  Plaintiff's motion for summary judgment granting benefits from May 1, 2000 forward is granted insofar as it seeks remand to the Commissioner.  It is denied insofar as it seeks a determination that plaintiff is disabled.  This case is remanded to the Commissioner for the limited purpose of obtaining additional opinion testimony from a vocational expert, reconsideration of plaintiff's residual functional capacity, and a redetermination of continued eligibility in light of the additional evidence.  This is a "sentence four" remand.

ENTER:

_____
JOAN HUMPHREY LEFKOW

Dated: July 19, 2012                     United States District Judge